IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY.

### NOVEMBER TERM, 1904.

---

PERCY R. VAN RIPER v. NEW YORK, SUSQUEHANNA AND
WESTERN RAILROAD COMPANY.

*Argued June 14, 1904—Decided November 7, 1904.*

1. V., driving a truck along a public highway which crossed a railroad, and having, when he reached a point thirty-two feet from the crossing, a clear view of the tracks to the east for more than half a mile, which view remained unobstructed until after the crossing was reached, drove upon the tracks in front of a train approaching from the east. A collision occurred, and he was injured. *Held*, that his failure to observe the approach of the train in time to avoid the accident (no fact appearing in the case which excused him from the duty of looking and listening) was negligence on his part which contributed to his injury.

2. The neglect of a gateman at a railroad crossing to lower his gates when a train is coming toward the crossing, does not excuse a traveler upon the highway, who is about to cross the tracks, from making independent observation for the purpose of ascertaining whether or not a train is approaching.

---

On rule to show cause.

345

Before GUMMERE, CHIEF JUSTICE, and Justices GARRISON and SWAYZE.

For the rule, *Collins & Corbin.*

*Contra, James G. Blauvelt.*

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The plaintiff in this case sued to recover compensation for injuries received by him, on an evening in December, at the crossing of the defendant company's railroad and Vreeland avenue, in the city of Paterson, in a collision between one of the company's trains, running on the westbound track, and a wagon in which the plaintiff was driving. The jury having rendered a verdict in his favor, the trial justice allowed a rule to show cause why it should not be set aside.

The plaintiff's description of the way in which the accident occurred is as follows: "I came out of Burke's saloon" (which appears to have been about seventy feet from the crossing) "and walked around my horses, and looked down the track and up the track, and saw nothing; then I got on my truck; after getting on the truck I swung the horses straight across the street to get on the right side of the street, looking down the track and up the track, and I saw nothing; when I got on the track there was a wagon passed me on the track; I was looking up the track towards Paterson at the time; my horses were about to go on the westbound track, and just then I glanced down the track and saw the train coming; and, on account of its being slippery, I knew I could not stop my horses, and I thought the next best thing was to get over; just then the gateman came running down the platform and grabbed my horses and stopped them on the track, and prevented me from going any further; the train came along and struck my horses and that is the last I know." He further stated that the gateman held his horses long enough for him to have gotten over the track twice, and that

after he (the gateman) saw that he could not do anything with them, he jumped out of the way to avoid getting hit himself. In answer to a question where the train was when he first saw it, he stated that it was just the other side of the station— at Thirty-ninth street. It appears from an examination of the map offered in evidence that Thirty-ninth street is one hundred and eighty feet east of Vreeland avenue. He further stated that he heard no bell rung, or whistle blown, and that he did not see the gateman make any attempt to lower the gates. He admits that he was familiar with the crossing, having passed over it frequently.

The following facts with relation to the surroundings at the scene of the accident appear by the undisputed testimony in the cause: A row of trees, which stood about forty-five feet from the first rail of the track upon which the collision took place, somewhat obstructed the view of the plaintiff in the direction from which the train was approaching; as he drew nearer the crossing his view was also obstructed to some extent by telegraph poles; but upon reaching a point thirty-two feet from the first rail of the defendant's westbound track, measured along the centre line of the avenue, he had an unobstructed view down the track in that direction for a distance of more than half a mile, and that view continued to be entirely uninterrupted until the crossing was reached, except so far as it was interfered with by the presence of a gate, maintained by the railroad company for the protection of the crossing. The train was a passenger train, the cars of which were lighted up; the headlight on the engine was burning.

It seems evident that, on the plaintiff's own story, coupled with the undisputed facts in the case, the accident which produced his injury was, at least partly, due to his own careless conduct. He says that although he looked up the tracks and down the tracks, he did not observe the approaching train until the horses were upon the westbound track, and that it was then only a block away, a distance of one hundred and eighty feet, as already stated. To have reached the point

where it was when the plaintiff first saw it, the train must have been in plain sight at the time when he passed the last obstruction to his view; that is, the telegraph poles. A moment's consideration will demonstrate this. The distance traveled by him after passing that obstruction was thirty-two feet, less the length of his horses. Assuming that his horses were walking (it does not appear at what gait they were traveling) and were moving not faster than a mile and a half an hour, which is much slower than a horse usually walks, and that the train was moving at the rate of seventy-five miles an hour, which is almost the extreme limit of speed of a passenger train, the train was moving just fifty times as rapidly as the plaintiff's team and, of course, covered just fifty times the distance. In other words, while the plaintiff's team was moving thirty feet the defendant's train was moving fifteen hundred feet and, consequently, was only sixteen hundred and eighty feet (less than one-third of a mile) from the crossing when the plaintiff reached the point where he had an entirely unobstructed view. Probably the plaintiff's team was moving less slowly and the train less rapidly than suggested. In either event the train would have been still nearer to the crossing at the time when the plaintiff's view in its direction ceased to be interfered with. Of course, the nearer the plaintiff approached the crossing the nearer the train approached the same point and the more readily it became discernible. Why, then, did the plaintiff fail to observe it until his horses were on the track and it was only one hundred and eighty feet away? The answer is obvious. Either he did not look after reaching the point where looking would have been effective to warn him of the approaching danger, or else his looking was done in such a perfunctory way as to be of no avail as a means of protecting him from it. In either event he did not exercise that reasonable degree of caution which the law imposes upon a person about to cross the tracks of a railroad. And this lack of due care on his part was a contributing cause to his injury. *Pennsylvania*

*Railroad Co.* v. *Righter,* 13 *Vroom* 180; *Delaware, Lacka-
wanna and Western Railroad Co.* v. *Hefferan,* 28 *Id.* 149;
*Conkling* v. *Erie Railroad Co.,* 34 *Id.* 338. Through his
failure to observe the train he had placed himself in a po-
sition manifestly of great danger. His own judgment was
that his best chance of escape was to endeavor to cross over
in front of the advancing train. The gateman, who risked
his life to prevent the happening of the accident, thought
the wiser course to pursue was to attempt to back the horses
off the track. It may be that either course, if not inter-
fered with, would have been successful in preventing the
collision. As it was, the resistance by each of the efforts of
the other prevented either plan from succeeding. Conceding
that the method attempted to be pursued by the plaintiff to
escape the danger which he had incurred was the wiser one,
and that the attempt of the gateman to back the horses from
the track was ill-advised, the fact still remains that the pres-
ence of the plaintiff upon the track was the original pro-
ducing cause of the accident and was due to his negligence
in not observing the nearness of the defendant's train.

It is urged that even if the plaintiff did not look for an
approaching train as he proceeded towards the crossing, his
failure to do so was not carelessness on his part, because the
failure of the gateman to lower the gates which protected
the crossing justified him in assuming that no train was near.
A similar contention was urged in the case of *Swanson* v.
*Central Railroad Co.,* 34 *Vroom* 605, but it was there held
that the failure of a flagman, or gateman, to perform the
duty which his position required, like the failure of an
engineer to blow his whistle, or of a fireman to ring his bell,
does not absolve the passenger on the highway from the use
of independent observation for his own protection, and that,
notwithstanding that such non-action on the part of the rail-
road company's employe is in effect a declaration that the way
is clear, the failure of the traveler on the highway to make
independent observation is ordinarily a failure to exercise

that reasonable degree of prudence which the law requires of all persons approaching these known places of danger. The same principle underlies the decision in *Conkling* v. *Erie Railroad Co., supra.*

The rule to show cause should be made absolute.