32 N.J. Super. 289 (1954)
108 A.2d 276
IRA L. PANGBORN, AS GENERAL ADMINISTRATOR AND AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF WILLIAM IRA PANGBORN, DECEASED, AND WILBUR FORNER, AN INFANT, BY HIS GUARDIAN AD LITEM, ANNA FORNER GIARRETTA AND ANNA FORNER GIARRETTA, PLAINTIFFS-RESPONDENTS,
v.
THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1954.
Decided October 4, 1954.
*292 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Stanley W. Greenfield argued the cause for the respondents (Mr. Francis A. Gordon, attorney).
Mr. Huyler E. Romond argued the cause for the appellant (Messrs. Toolan, Haney & Romond, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
This appeal involves a railroad crossing accident in which William Ira Pangborn, age 17, was killed and Wilbur Forner, age 15, was injured. In the negligence action which followed against the railroad a jury verdict of $15,000 was returned in favor of the Administrator ad prosequendum of Pangborn, one of $7,000 in favor of Forner for his injuries, and one of $3,000 for his mother, Anna Forner Giarretta, for consequential losses. The mother's verdict was reduced on appropriate motion to $1,250.
The railroad appeals, charging principally that it was error to deny the motion to dismiss which was made on the ground that both the decedent and Forner were guilty of contributory negligence as a matter of law. Determination *293 of the problem necessarily requires a consideration of the facts.
Washington Avenue, Dunellen, the scene of the mishap, runs north and south and crosses six mainline east and west-bound tracks of appellant Central Railroad Company at grade. The six sets of tracks are divided by an open iron picket fence which terminates at the westerly line of Washington Avenue. The fence is in the center of the track right of way so that three sets of west-bound tracks are on the north side thereof and three sets of east-bound tracks are on the south side. A map introduced in evidence designates the most northerly east-bound track as No. 1, the middle one, No. 3, and the most southerly east-bound track as No. 5. On the other side of the fence, the first or most southerly west-bound track was designated as No. 2, the middle one, No. 4, and the outside or most northerly west-bound track as No. 6.
The crossing is protected by gates which when down extend across the roadway of Washington Avenue and the public sidewalks on the easterly and westerly side thereof. At the southwesterly corner of the crossing there is a watchman's tower overlooking the tracks where the operator of the gates is stationed.
West of Washington Avenue along the northerly side of the right of way there are a newsstand, then the west-bound passenger station and, some distance farther along, a freight house, the westerly wall of which is 417 feet from Washington Avenue. To the rear of the freight house are two sets of tracks which appear to lead into track No. 6 near the next intersecting public street, Prospect Avenue, which is 623 feet from Washington Avenue.
In front of the west-bound station and between it and track No. 6 there is a paved walk by means of which persons alighting from trains walk east to Washington Avenue. This path is 12 feet 6 inches wide between the newsstand and Washington Avenue. When the crossing gate is down there is a distance of 7 feet between it and the northerly rail of track No. 6.
On the southerly side of the tracks an east-bound passenger station is located.
*294 Some distance east of Washington Avenue and on the north side of track No. 6 a freight yard is located. It appears without dispute that the use of track No. 6 was not limited to west-bound traffic. Some west-bound passenger trains out of New York terminated their run at Dunellen. Upon the discharge of passengers such trains would be backed in an easterly direction along No. 6 past Washington Avenue, then shunted off to the north into the freight yard or round house area on a track which ends about 1,000 feet east of the station. That is where they would "tie up." There was testimony also that trains back east on track No. 6 into this area "at night, any time" and pick up cars. It appears also that in the morning some passenger trains for New York start on track No. 6, cross Washington Avenue, then switch over to track No. 1 or No. 3 and continue east toward their destination. And one of the photographs in evidence shows a switch which begins in plain view at track No. 6 about at the easterly side of Washington Avenue and crosses the intervening rails to the east-bound tracks. Freight trains operate back and forth, east and west, along track No. 6 across Washington Avenue and between the freight yard and the freight house and the side tracks which are west of the passenger station. One railroad witness described track No. 6 as an "unassigned track."
On April 3, 1951 three boys, William Pangborn, Wilbur Forner and Robert Reuter, left Dunellen High School for the lunch recess; all of them lived south of Washington Avenue. In proceeding toward their homes they went across railroad property, walked between the west-bound passenger station and the newsstand and came on to the paved walk already described, which runs from the station to Washington Avenue.
On reaching the walk, they turned east and proceeded toward Washington Avenue. Reuter, the only one who testified about these events (Pangborn having been killed and Forner, because of his head injury, having no recollection of them), said that when they came on to the walk he made no observation to his right for any trains on track No. 6 *295 west of the station, nor did he see any on that track at the station or between it and Washington Avenue. However, he did see a long, noisy freight train west bound on track No. 2.
They walked abreast down toward Washington Avenue, Pangborn nearest the track, Forner next, and Reuter on the outside. As they approached the avenue the crossing gates were down and they stopped inside the gates, between the gates and the track. The evidence clearly demonstrates that at this point they were on the public street, that is, inside the westerly line of Washington Avenue.
According to Reuter, he passed over this grade crossing four times daily, presumably going to and from high school. He knew that some west-bound passenger trains came into the station and then backed easterly across the highway and "returned to the yards." Forner said he was familiar with the crossing, without further elaboration, and it appears from the testimony of his mother that she had lived at the same address south of the crossing for about 13 years before the accident.
To come back to the circumstances of the accident: The boys stood at the place indicated between the gates and the northerly rail of track No. 6 facing east and somewhat to the south, watching the long west-bound freight as it proceeded. While doing so their positions with respect to each other and to the tracks remained relatively the same. According to Reuter, Pangborn was two to two and one-half feet from the first rail; Forner was three to four feet from the rail and slightly ahead or east of Pangborn; and Reuter was about six feet from the rail and also slightly east of Forner.
The boys remained standing in this position intent on the passing freight train. After a lapse of ten seconds, the first car of another freight train consisting of two cars, which were being pushed by an engine in an easterly direction on track No. 6 to the freight yard, struck Pangborn, who obviously was standing too close to the track. As already indicated, his position was two to two and one-half feet *296 from the track and the proof showed that the overhang of the freight car beyond the northerly rail was two feet five inches.
Reuter only saw the car strike Pangborn; he could not say whether it struck Forner also, or whether after the impact Pangborn was thrown into Forner. Since Forner had no recollection of the accident at the trial, the only other witness to the accident was one Mikell, the conductor on the freight involved. He testified that the car struck the first boy (Pangborn) and "knocked" him "agin the other one" (Forner). Forner apparently was thrown to the ground and Pangborn under the car.
Reuter said that at no time did he ever look to the west for trains on track No. 6, and at no time did he see any train except the west-bound freight. During the ten-second period referred to, the three boys stood in the positions described with their backs to the west. Neither Pangborn nor Forner changed his position before the accident, nor to Reuter's knowledge did either one turn and look to the west. He asserted also that the track No. 6 train did not give any signal or warning of its approach.
According to the railroad employees in charge of the fatal train, they were engaged in drilling at the time. The engine they used had come to Dunellen from Cranford that morning and had picked them up, as crew, at various points along track No. 6 between the station and freight house west of Washington Avenue.
They proceeded along track No. 6 about to Prospect Street, then switched off to the track which was in the rear of the freight house. There they picked up a box car and brought it out on track No. 6. Then a second car was pulled or pushed out and coupled to the first, following which the engine was coupled to them so that its front was facing east and it began to push them eastwardly to the intended destination, namely, the freight yard east of Washington Avenue. The train moved in this fashion at a speed of four to five miles an hour from the point of completion of the coupling, past the freight house and then over the 417 feet between *297 the freight house and Washington Avenue, where the accident happened. The several members of the crew testified that the automatic engine bell was ringing continuously from the freight house to the place of the mishap. There is evidence also that looking west along track No. 6 from Washington Avenue there is a clear and unobstructed view for at least one-half mile.
With the proofs in this state, appellant made its motion to dismiss on the ground of contributory negligence.
The briefs of the parties treat the problem as though Pangborn's administrator and Forner occupy precisely the same position and that the same legal principles should apply to and control both actions. Our study of the record has convinced us that separate consideration is necessary and in fact that diverse results are required on this appeal.
Appellant argues that a railroad crossing is a place of danger and that it is the duty of a pedestrian on a public walk to recognize it as such and to exercise for his own safety there the degree of care which a reasonably prudent man would adopt; further, that a pedestrian who is about to pass over a crossing is bound to use his eyes and ears and to guard against the approach of trains by looking each way before crossing and that failure of the railroad company to give the statutory signal will not relieve him from making this dual observation, if he has an opportunity by a view of the road to avoid danger. That this expresses the law cannot be doubted. George Siegler Co. v. Norton, 8 N.J. 374 (1952); Di Giendemonica v. Pennsylvania-Reading Seashore Lines, 123 N.J.L. 296 (E. & A. 1939); Van Riper v. New York, Susquehanna & W.R. Co., 71 N.J.L. 345 (Sup. Ct. 1904); Swanson v. Central R. Co., 63 N.J.L. 605 (E. & A. 1899); Pennsylvania R. Co. v. Righter, 42 N.J.L. 180 (E. & A. 1880).
While these principles are important and relevant, it must be kept in mind that the boys were standing at the crossing at the time of the mishap and for some short time before. This situation seems to call for recognition of a more closely applicable and indeed controlling doctrine. When a *298 person on a station platform or on a public way places himself so close to a railroad track as to be struck by the ordinary overhang of a properly constructed train, he is guilty of contributory negligence. Dotson v. Erie R. Co., 68 N.J.L. 679 (E. & A. 1903); Higgins v. Erie R. Co., 89 N.J.L. 629 (E. & A. 1916); Long v. Delaware, L. & W.R.R. Co., 127 N.J.L. 207 (E. & A. 1941).
The overhang of the freight car in question was two feet five inches beyond the northerly rail of track No. 6. There is no evidence whatever that such extension was not normal construction. Pangborn, who had placed himself two to two and one-half feet from the tracks, was struck by the overhang. His act in standing so close establishes his contributory fault and precludes recovery. Consequently, the motion to dismiss should have been granted in the death action.
A somewhat different situation exists as to Forner. The proof indicates that he stood three or four feet from the tracks. Assuming this to be so, he was clear of the overhang and safe from contact with it. Moreover, there is no actual proof that the projection of the body of the freight car struck him. And there is some substantial evidence that Pangborn was propelled against him on impact with the train. Pangborn's negligence is not imputable to him, nor would the fact that his injuries came about as the result of the combined or concurrent negligence of the railroad and Pangborn have any adverse influence on his recovery.
Under the circumstances, in our judgment the issue of Forner's contributory negligence was for determination by the jury. Therefore, there was no error in refusing to dismiss his action on that ground.
It is suggested by appellant that when Forner saw that the crossing gates were down as he reached Washington Avenue, he was duty bound to go in back of them and remain there until they were raised as an invitation to cross. And it is urged that such failure made him a licensee to whom the only obligation was to refrain from willfully or wantonly injuring him.
*299 Crossing gates have no such legal potency. The act of lowering them cannot transform one who is a lawful user of the public highway into a licensee even if he ignores their significance. However, they do constitute an obvious warning of the approach of a train and they bear materially upon the issue of contributory negligence by emphasizing the duty to look for danger. Cf. Samkiwicz v. Atlantic City R. Co., 82 N.J.L. 478 (E. & A. 1911).
The only other alleged error requiring consideration arises from the refusal to dismiss the per quod count of Forner's mother, Anna Forner Giarretta. The ground urged at the trial (although not raised in the answer or pretrial order) was that since the proof showed the boy's father to be alive, the action for loss of services and earnings belongs under the statute, N.J.S.A. 9:1-1, to the parents equally, and must be brought by them jointly.
The statute referred to provides that:
"The father and mother of a minor child are equally entitled to its services and earnings. If one of the parents be dead, has abandoned the child, or has been deprived of its custody by direction of court, the other is entitled to such services and earnings.
The parents jointly may maintain an action for the loss of the wages or services of their minor child when such loss is occasioned by an injury, wrongfully or negligently inflicted upon such child. If one of the parents be dead, has abandoned the child, has been deprived of its custody by direction of court or refuses to sue, the other may sue alone. * * *"
It is conceded here that Forner's parents are divorced, that Mrs. Forner has remarried and that the boy lives with her. From all of the evidence in the record the inference is possible that upon the divorce, custody of Robert was given to Mrs. Forner. There is nothing in the record from which any contrary inferences can be drawn.
But further, the equal right referred to in the statute relates to services and earnings of the child. No proof was offered at the trial of any loss thereof and the jury was not instructed to consider any such loss in the computation of damages.
*300 Consequently, it was not error to deny the motion.
On the whole case the judgment in favor of Ira L. Pangborn, as administrator ad prosequendum of William Ira Pangborn, is reversed and the record remanded for the entry of judgment for appellant, and the judgments in favor of Wilbur Forner and Anna Forner Giarretta are affirmed without costs.
JAYNE, J.A.D. (dissenting).
Upon a circumspect examination of the testimony and exhibits, I reach the conclusion that in the absence of any proof that the decedent had knowledge that railroad trains were operated in an easterly direction on the west-bound track designated as No. 6, and had reason to contemplate the extent of the overhang of the freight car which collided with him, and the fact that he was standing within the boundaries of the public highway crossing and not upon railroad property, in association with all the other relevant circumstances, the action of the trial judge in submitting to the jury the issue of the alleged contributory negligence of the relatively youthful decedent was not erroneous.